## IN RE STATE of Texas, relator

### No. 15-0139

Supreme Court of Texas.

OPINION DELIVERED: April 15, 2016

Sherine Elizabeth Thomas, Travis County Attorney's Office, Austin, for Amicus Curiae County of Travis.

Brian Thompson, Jeffrey Craig Hopper, Hopper Mikeska, PLLC, Catherine A. Mauzy, Mauzy & Tucker PLLC, Charles Herring Jr., Herring & Panzer L.L.P., Jess M. Irwin III, Herring & Irwin, L.L.P., Kurt Howard Kuhn, Lisa Bowlin Hobbs, Kuhn Hobbs PLLC, Austin, for Real Parties in Interest Suzanne Bryant and Sarah Goodfriend.

Beth Ellen Klusmann, Assistant Solicitor General, Charles E. Roy, First Assistant Attorney General, Office of the Attorney General, Michael P. Murphy, Asst. Solicitor General, Scott A. Keller, Office of the Attorney General, Solicitor General's Division, Warren Kenneth Paxton, Attorney General of Texas, Office of the Attorney General, Austin, for Relator State of Texas.

Justice Willett, joined by Justice Devine, concurring in the dismissal of the petition for writ of mandamus.

Last summer, the United States Supreme Court in *Obergefell v. Hodges* constitutionalized a 50-state right to same-sex marriage.[1] For all practical purposes, that federal constitutional case disposes of this state procedural case. The core controversy—whether the Fourteenth Amendment forbids States from preferring traditional marriage—is decided, although, as with a stone dropped into a pond, assorted spin-off disputes are rippling swiftly throughout post-*Obergefell* America.

I write today not to belabor a societal debate but to underscore a legal point presumably *beyond* debate: Laws matter. When John Adams enshrined the ideal of "a government of laws and not of men" into the 1780 Massachusetts Constitution, he upended things, declaring that citizens should be governed by clear laws consistently applied, not personal whims.[2] Adams was echoing Aristotle, who two millennia earlier wrote, "law should govern." [3] The Rule of Law is one of America's—and Texas's—foundational presumptions. In this case, regrettably, Texas law was frustrated rather than followed.

Section 402.010 of the Government Code plainly requires Texas courts to notify the attorney general of state constitutional challenges.[4] Not only that, section 402.010 also forbids courts from declaring a statute unconstitutional within 45 days after giving such notice.[5] "The purpose of this statute is to provide the attorney general with the

---

1. —— U.S. ——, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015).

2. *See* MASS. CONST. pt. 1, art. XXX.

3. *See* ARISTOTLE'S POLITICS: A TREATISE ON GOVERNMENT, bk. III, ch. 16, at 117 (William Ellis trans., 1895); *see also* F.A. HAYEK, THE CONSTITUTION OF LIBERTY 145 (1960) ("There is clear evidence that the modern use of the phrase 'government by laws and not by men' derives directly from this statement of Aristotle.").

4. TEX. GOV'T CODE § 402.010(a) ("The court shall, if the attorney general is not a party to or counsel involved in the litigation, serve notice of the constitutional challenge and a copy of the petition, motion, or other pleading that raises the challenge on the attorney general.... ")

5. *Id.* § 402.010(b) ("A court may not enter a final judgment holding a statute of this state unconstitutional before the 45th day after the date notice required by Subsection (a) is served on the attorney general.").

opportunity to be heard on issues important to the laws of the state—the laws the attorney general's office is charged with defending and enforcing." [6]

Make no mistake: The Legislature well understands how to give courts wiggle room, and some Texas notice rules expressly permit case-by-case discretion.[7] But not this one. A court's duty to alert the attorney general to constitutional attacks is categorical: "The court shall...." [8] The Legislature imposed a no-exceptions rule, including for cases—and causes—thought to be exigent or momentous.

In this case, rather than the statutorily mandated 45–day minimum, a mere *one minute* elapsed between the trial court's order allowing the plaintiffs to file their pleadings in paper form (8:51 a.m.) and its order finding that the "unconstitutional statutory and state constitutional prohibitions in Texas against same-sex marriage" were causing the plaintiffs immediate and irreparable damage (8:52 a.m.). Despite the constitutional stakes (or perhaps because of them), the trial court failed to comply with the Legislature's unqualified command that the State's chief legal officer be afforded the opportunity to defend the constitutionality of Texas law.[9]

**6.** *In re State*, No. 04–14–00282–CV, 2014 WL 2443910, at *2 (Tex.App.—San Antonio, May 28, 2014, orig. proceeding) (mem. op.).

**7.** *See, e.g.*, TEX. GOV'T CODE §.75.551(a)(2) (requiring notice to attorneys in a case of a judicial assignment "if it is reasonable and practicable and if time permits"); TEX. AGRIC. CODE § 72.044(b) (sanctioning notice to an opposing party "if the court determines that justice requires the notice"); TEX. R. CIV. P. 245 (permitting courts to set cases for trial "on written request of any party, or on the court's own motion, with *reasonable* notice" (emphasis added)).

**8.** TEX. GOV'T CODE § 402.010(a).

**9.** Perhaps the trial court thought itself free to disregard section 402.010. Two days before this litigation began, a Travis County probate court in an estate proceeding had purported to strike down certain Texas marriage laws. The State sought appellate relief that same day. Plaintiffs in today's case referenced the probate court's order in their original petition and application for a temporary restraining order. It is thus possible the trial court believed the probate court's order had altered the status quo and was binding precedent, somehow dispensing with the notification requirement. Possible, maybe. Plausible, hardly.

First, courts are not bound by the decisions of other courts of non-superior jurisdiction. That is, Texas courts are obligated to follow only higher Texas courts and the United States Supreme Court. Second, the trial court knew when it granted the TRO that (1) the State had already appealed the probate court's ruling, and (2) the constitutionality of Texas's opposite-sex marriage laws was also pending in this Court. Third, the trial court's order was more expansive than the probate court's order. The probate court only invalidated sections 2.401 and 6.204(b) of the Family Code and article I, section 32, of the Texas Constitution. By contrast, plaintiffs here challenged, and the trial court invalidated, all "statutory and state constitutional prohibitions in Texas against same-sex marriage, including as set out in and applied through Texas Family Code §§ 2.001, 2.012, and 6.204, and in Article I, § 32 of the Texas Constitution." The trial court thus invalidated laws not previously invalidated by the probate court—sections 2.001 and 2.012, together with all other statutory and constitutional prohibitions of same-sex marriage. Fourth, the notification statute—section 402.010—contains no exceptions. There is nothing opaque or discretionary about it. Texas trial courts are required to notify the attorney general every time Texas law comes under constitutional attack. Period. The probate court's non-precedential order from two days earlier cannot justify the trial court's disregard of section 402.010.

Theoretically, a civil court could declare section 402.010 itself unconstitutional on separation-of-powers grounds, as the Court of Criminal Appeals has done on the criminal-law side. *Ex parte Lo*, 424 S.W.3d 10, 29 (Tex.Crim.App.2013). That did not happen here. Section 402.010 was not overturned—it was overlooked.

When violations of law slip uncorrected through the cracks of judicial review (as when a case is dismissed as moot), it may seem that the beneficiaries of such violations receive a free pass. The pass is not free. It comes at the expense of the Rule of Law. Here, the Legislature's notice mandate is unsubtle and unequivocal, as was the trial court's failure to follow it.

Unfortunately, rancorous cultural disputes seem to induce jugglery, by lawyers and judges alike. In 2014, for example, a Texas court of appeals rebuked a trial court for doing the very thing that happened here—declaring Texas marriage law unconstitutional without first alerting the attorney general.[10] But it is precisely in divisive, consequential cases when by-the-book fastidiousness by courts is most vital, to blunt even the appearance of evasive corner-cutting or politicized judging.

This was an invalid invalidation. No matter the cause du jour, no matter the perceived exigencies, Texas law forbids the striking down of Texas law without first respecting the attorney general's statutory opportunity—and constitutional duty—to defend it. Every Texas jurist swears allegiance to the Rule of Law, vowing to "preserve, protect, and defend the Constitution and laws of the United States and of this State, so help me God."[11] That solemn oath comes first—always—not our ideology, not our legacy, and not our desire to be fêted as on the "right side of history."

No doubt, the attorney general's presence in a lawsuit may be unwelcome:

I understand that in certain proceedings everyone in the courtroom—litigants, counsel, and judges alike—may prefer

no involvement by the attorney general. But Texas law commands involvement by the attorney general, no matter how righteous or urgent the cause is thought to be. That's precisely the point of the notice law. The Legislature has determined that state law is entitled to a vigorous defense. The attorney general isn't omnipresent, able to monitor every filing in every courthouse across 254 counties. The tension is between what the parties logically want (their case off the radar) and what Texas legally requires (their case on the radar). The notice law recognizes, and forthrightly aims to thwart, the desire to engage in procedural corner-cutting to avoid unwanted attention.[12]

Texas law could not be clearer: The State's chief legal officer—sworn to "preserve, protect, and defend" Texas law—should in fact be permitted to preserve, protect, and defend it. Circumvention of that law, by courts and by officers of courts, is an unacceptable way to litigate fateful constitutional issues. The attorney general may be right. He may be wrong. But he must be heard.[13]

By a 5–4 vote, the Highest Court in the Land has mandated the recognition of same-sex marriage from sea to shining sea. People of goodwill can debate the merits of that ruling, but no one can debate the clarity of section 402.010. A Texas court's notice duty is mandatory—zero exceptions.

My focus today is legal, not cultural. In a judicial system that demands no-favorites adherence to clear and predictable

---

10. *In re State*, 2014 WL 2443910, at *4 (holding that "the trial court abused its discretion in failing to provide notice to the attorney general of a constitutional challenge to Texas state laws").

11. Tex. Const. art. XVI, § 1.

12. *State v. Naylor*, 466 S.W.3d 783, 804 (Tex. 2015) (Willett, J., dissenting).

13. *See id.*

legal rules, furtiveness (to tilt the playing field) and faithfulness (to keep it level) cannot coexist. Faithfully applying the law cannot mean short-circuiting one Texas law in order to strike down another.

A law may be unfashionable. It may even be unconstitutional. But it cannot be undefended.

Justice Brown, joined by Justice Devine, concurring in the dismissal of the petition for writ of mandamus.

In a span of less than three hours on February 19, 2015, the lawyer for the real parties in interest, Sarah Goodfriend and Suzanne Bryant, accomplished quite a lot:

- He filed a lawsuit challenging the constitutionality of provisions in the Texas Constitution and Texas Family Code stating that marriage in Texas can only be between one man and one woman;
- He obtained a temporary restraining order in the same civil lawsuit—from a district judge who usually hears only criminal cases, with no notice to the Attorney General, and facing, at best, token opposition from the Travis County Attorney's office—which allowed his clients to obtain a marriage license from the Travis County Clerk;
- He obtained for his clients a waiver of the Texas Family Code's mandatory 72–hour waiting period between the issuance of a marriage license and the performance of a marriage ceremony; and
- To avoid intervention by the Attorney General or appellate review, he nonsuited the lawsuit following his clients' marriage ceremony on the courthouse steps.

Despite the nonsuit, the Attorney General filed a petition for writ of mandamus the next day challenging the validity of the trial court's order.

Today this Court dismisses that mandamus petition as moot. In light of the United States Supreme Court's 5–4 decision in *Obergefell v. Hodges*,[1] I cannot dispute this disposition. But the fact remains that the temporary restraining order was a deliberate and premeditated misuse of the Texas justice system—and that I cannot overlook.

Anyone with elementary knowledge of Texas civil procedure knows that "[t]he purpose of a TRO is to preserve the status quo."[2] In any given case, the status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy."[3] In this case, the status quo was that marriage in Texas was limited to the union of one man and one woman. So says the Texas Constitution, the Texas Family Code, and Texas common law.[4] Indeed, so says all of pre–21st–century American history and all of Western Civilization from the beginning of Christendom to the modern day.[5] More pointedly, at

---

1. —— U.S. ——, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015).

2. *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004).

3. *Id.* (internal quotation marks omitted).

4. *See* Tex. Const. art. I, § 32; Tex. Fam. Code §§ 2.001, 6.204; *Grigsby v. Reib*, 105 Tex. 597, 153 S.W. 1124, 1130 (1913) ("Marriage is not a contract, but a status created by mutual consent of one man and one woman.").

5. In his dissenting opinion in *Obergefell*, Justice Antonin Scalia noted that from the time of its ratification until this century, the Fourteenth Amendment had never been thought to grant a right to same-sex marriage:

> When the Fourteenth Amendment was ratified in 1868, every State limited marriage to one man and one woman, and no one doubted the constitutionality of doing so.

the time the TRO in this case was requested and granted, no court with any precedential authority over any Texas state court had altered that status quo. Both the lawyer seeking the TRO and the judge who granted it knew and ignored this fact.

It is also fundamental that a trial court abuses its discretion when it makes a final adjudication in a TRO.[6] It's right there in the title—*temporary* restraining order. TROs may be obtained ex parte, with little to no notice to the opposing side, and in a non-evidentiary hearing precisely because the law intends for them only to preserve the status quo until the trial court convenes a properly noticed, adversarial, and evidentiary hearing on the injunctive relief the plaintiff seeks.[7] Texas law should not be declared unconstitutional "based merely on pleadings and a brief, non-evidentiary TRO hearing when substantial rights are involved and the issues are far from clear."[8] Yet that's exactly what happened here. The TRO provided the real parties in interest all of the relief they sought. After a short hearing during which no testimony or other evidence was received—in which no court reporter's record was even taken—the trial court declared Texas marriage law unconstitutional and authorized a union explicitly prohibited under Texas law. Then, once the marriage ceremony was complete, the couple's lawyer quickly nonsuited the case.[9]

That resolves these cases. When it comes to determining the meaning of a vague constitutional provision—such as "due process of law" or "equal protection of the laws"—it is unquestionable that the People who ratified that provision did not understand it to prohibit a practice that remained both universal and uncontroversial in the years after ratification. We have no basis for striking down a practice that is not expressly prohibited by the Fourteenth Amendment's text, and that bears the endorsement of a long tradition of open, widespread, and unchallenged use dating back to the Amendment's ratification. . . . The five Justices who compose today's majority are entirely comfortable concluding that every State violated the Constitution for all of the 135 years between the Fourteenth Amendment's ratification and Massachusetts' permitting of same-sex marriages in 2003. They have discovered in the Fourteenth Amendment a "fundamental right" overlooked by every person alive at the time of ratification, and almost everyone else in the time since. They see what lesser legal minds—minds like Thomas Cooley, John Marshall Harlan, Oliver Wendell Holmes, Jr., Learned Hand, Louis Brandeis, William Howard Taft, Benjamin Cardozo, Hugo Black, Felix Frankfurter, Robert Jackson, and Henry Friendly—could not. They are certain that the People ratified the Fourteenth Amendment to bestow on them the power to remove questions from the democratic process when that is called for by their "reasoned judgment." These Justices *know* that limiting marriage to one man and one woman is contrary to reason; they *know* that an institution as old as government itself, and accepted by every nation in history until 15 years ago, cannot possibly be supported by anything other than ignorance or bigotry. And they are willing to say that any citizen who does not agree with that, who adheres to what was, until 15 years ago, the unanimous judgment of all generations and all societies, stands against the Constitution.

*Obergefell*, 135 S.Ct. at 2628, 2629–30 (Scalia, J., dissenting) (emphasis in original).

6. *See Newton*, 146 S.W.3d at 652; *Janus Films, Inc. v. City of Fort Worth*, 163 Tex. 616, 358 S.W.2d 589, 590 (1962) (per curiam).

7. See Tex. R. Civ. P. 680; *Houston Belt & Terminal Ry. Co. v. Tex. & N.O.R. Co.*, 155 Tex. 407, 289 S.W.2d 217, 219 (1956).

8. *Newton*, 146 S.W.3d at 651.

9. *See Epps v. Fowler*, 351 S.W.3d 862, 870 (Tex.2011) (disfavoring "nonsuits that are filed to circumvent unfavorable legal restrictions or rulings"). After exchanging vows, Bryant reportedly said: "Let's get back in (to register the marriage) before they make it illegal!" Chuck Lindell, *First Gay Marriage in Texas*, Austin American-Statesman, Feb. 20, 2015, at A1.

Counsel followed up this suborned abuse of discretion by bragging to the news media that neither the Attorney General nor this Court could do anything about it. "We got our people married," he told one newspaper.[10] Dismissing this mandamus action as an improper end run around court procedure, he further insisted that the Attorney General "can't retroactively undo a marriage by saying the order was not valid. There is no procedure for that."[11] The Attorney General's challenge to the TRO, he maintained, has "no practical meaning."[12]

These comments paired with the conduct he exhibited in this litigation make this fact obvious: the lawyer for the real parties in interest intentionally and illegitimately gamed the system—and the trial court helped him do it. Neither zealous advocacy on behalf of one's clients nor a desire to be on "the right side of history" is an excuse for cynically manipulating a system that necessarily relies on the bench's and bar's high regard for the law. The ends do not justify the means.

Members of the legal profession have agreed to live under rules proclaiming that it is "a lawyer's duty to uphold legal process," that "[a] lawyer's conduct should conform to the requirements of the law," and that "[a] lawyer should demonstrate respect for the legal system and for those who serve it...."[13] The continued viability of the rule of law depends on the bench and bar adhering faithfully to these obligations. To do otherwise impugns the integrity of our judicial institutions and undermines the public's trust in their objectivity and reliability.

As judges and lawyers, we bear a sacred obligation to uphold the rule of law even when the law does not conform to what we believe it should be. That duty includes withstanding the temptation to bend and abuse legal process to collect an earnestly desired result the law simply does not provide. Those who underhandedly indulge that temptation dishonor both our profession and the rule of law.

10. Chuck Lindell, *'I've Got It': With License in Hand, Pair Make History in Joyful Rush*, AUSTIN AMERICAN-STATESMAN, Feb. 20, 2015, at A1.

11. Chuck Lindell, *Paxton: Gay Marriage Won't Stand; Attorney General Says License Issued by Travis Clerk Illegal, Invalid*, AUSTIN AMERICAN-STATESMAN, Feb. 21, 2015, at A1.

12. Lindell, *'I've Got It', supra* note 10, at A1.

13. TEX. RULES DISCIPLINARY P. pmbl. ¶ 4.